UNITED STATES DISTRICT COURT SOUTHERN DISTRICT OF FLORIDA
CASE NO.: 15-81222-CIV-MARRA

STACEY BLAKE, and others similarly situated,

      Plaintiff,

v.

JAMES BATMASIAN, et al.,

      Defendants.

_____/

## PLAINTIFFS' RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

Plaintiffs file this Response.  Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts (cited hereinafter as "Facts ¶ __") has been contemporaneously filed with the instant MSJ, along with Plaintiffs' own Statement of Undisputed Facts (cited herein as "Facts § II ¶ __").  Plaintiffs state as follows:

## I.  BACKGROUND

Plaintiff Stacey Blake ("Blake" or "SB") worked for the Defendants, until his employment was separated on or about March 2, 2015.  (Facts ¶ 3).  Plaintiff Karla Sotomayor ("Sotomayor" or "KS") worked under the title of "commercial leasing agent" ("CLA") for several years for Defendants. Blake worked as a CLA approximately Dec. 2012 - Aug. 2014; while KS worked under the title of CLA from 2009 until approximately July 2014, when she was terminated by Defendant James Batmasian ("JB"). (Facts ¶ 3)

As CLAs, Plaintiffs essentially served as customer service representatives by attending weekly mandatory meetings, answering phones in a customer service capacity, showing commercial properties owned by the Defendants to prospective tenants at the Defendants' properties, answering questions for walk-ins at the Defendants' offices, and running errands for JB and Daron Tersakyan ("DT") which had no relation to the leasing of commercial properties. (Facts ¶ 7). Notably, Plaintiffs were in no position to exercise any discretion or independent judgment with respect to matters of minor importance, let alone matters of significance. (Facts ¶ 7).  As an example, consider the fact that Plaintiffs were not permitted to (and did not) deviate from the terms of a standard lease document without express permission from Defendants or their management team and they could not sign tenant leases as they had no authority to bind the company. (Facts ¶ 7).  While employed by Defendants, Plaintiffs repeatedly complained about having to work overtime hours without properly being paid, but were told that the decision was Defendants and that overtime would be required every work week, but would not be paid.  (Facts II

¶ 18-22).  Defendants paid Plaintiffs an hourly wage and commission; the wages were paid through an account of Defendants in the name LSA Management, Inc., but the monthly commission checks were paid directly by "Investments Limited" which is owned by the Batmasians as a fictitious name. *Id.* ¶¶ 1, 3. The funds paid by Defendants to CLAs was subject to docking, if Plaintiffs failed to meet the requisite number of weekly hours as determined by Defendants. *Id.* ¶ 15. J.B. provided hundreds of vouchers, in lieu of overtime, to Plaintiffs so that they could receive "massages" and meals.  *Id.* ¶¶ 23-34 Defendants intentionally failed to pay overtime to Plaintiffs to simply cheat them out of their wages, and Defendants knew Plaintiffs were working overtime, and that federal law requires employees to be compensated at time and one-half per hour for overtime pay.  *Id.*

Defendants have moved for partial summary judgment solely as to the alleged exempt status of CLAs under the FLSA under the outside sales exemption. [DE 305 ¶ 3].  However, as explained in detail below, ***the exemption is not applicable because Defendants' own internal documents state that the CLAs are non-exempt which renders the instant Motion meritless*** (Facts I ¶ 7-9; Facts II ¶ 17), Plaintiffs' primary duties did not involve making "sales" within the meaning of the FLSA, obtaining orders or contracts for services or the use of facilities and because Plaintiffs were not customarily and regularly engaged away from Defendants' place or places of business in performing any of their duties at any point during their employment with the Defendants. 29 C.F.R. §§ 541.501-501.  Plaintiffs were not involved in outside sales as they were not required to nor did they ever make any "sales" period, let alone at the customer's place of business or the customer's home, and Defendants admit they do not sell anything.  29 C.F.R. § 541.502.  Thus, the denial of Defendants' MSJ is appropriate, as the record evidence establishes Defendants' failure to establish the applicability of the exemption by clear and convincing evidence, such that Defendants are not entitled to judgment on the exemption, as a matter of law. To the contrary, the record reflects that there is no genuine issue of material fact as to the *inapplicability* of the exemption, such that summary judgment is appropriate in favor of Plaintiffs regarding their non-exempt status under the FLSA. *See* [DE 326, 327].

## II.  <u>MEMORANDUM OF LAW</u>

### A.  APPLICABLE LEGAL STANDARDS

#### 1.  Standard for Summary Judgment and Spoliation

In deciding summary judgment motions, the evidence of the non-moving party will be believed as true, all evidence will be construed in the light most favorable to the non-moving

party, all reasonable inferences will be drawn in the non-moving party's favor, *Eastman Kodak Co. v. Image Technical Servs, Inc.*, 504 U.S. 451, 456 (1992), and all doubts will be resolved against the moving party. *Id.* The plaintiff is not required to prove his or her case in order to withstand a motion for summary judgment. *Harris v. H & W Contracting Co.*, 102 F.3d 516, 521 (11th Cir. 1996). Moreover, as to motions for summary judgment, this Circuit has stated that "[s]ummary judgment is a lethal weapon, and courts must be mindful of its aims and targets and beware of overkill in its use." *Tippens v. Celotex Corp.*, 805 F.2d 949, 952-53 (11th Cir. 1986).

The Plaintiffs filed their own msj which should be construed by the Court as a response to Defendant's MSJ and Plaintiffs' request that. *Hartsfield v. Williams,* 2015 WL 668980, at *1 (E.D. N.C. 2015) (treating cross-motion for sj as both a response in opposition and a cross motion for sj); *Jackson v. Geren*, 2008 WL 7728652, at *1 (D. Md. 2008) (same).

Concerning the exemption, Defendants destroyed all time records which reflected the times during which Plaintiffs arrived to and left from work and which would have unequivocally demonstrated that Plaintiffs were not engaged in outside sales as they were present at Defendants' offices during the majority of their workday and thus, physically, could not have been making sales at the customer's place of business or the customer's home. (Facts ¶ 11; 14). The destroyed records would also demonstrate that Plaintiffs had absolutely no ability to modify Defendants' established policies and procedures, contained within their employee handbook, as it relates to their work schedule and requisite weekly hours. This destruction of evidence was not consistent with Defendant's policies on document retention. (Facts ¶ 13). Consequently, Plaintiffs request that the Court deny Defendants' partial MSJ as to the application of the exemption because of Defendants' intentional spoliation of relevant evidence, and for sj purposes request that the Court take into consideration that this evidence would have benefited and supported Plaintiffs' positions as set forth herein. *Flury v. Daimler Chrysler Corp.,* 427 F.3d 939, 944 (11th Cir. 2005); *Bashir v. Amtrak,* 119 F.3d 929, 931 (11th Cir. 1997).

### 2.   The Standard of Review of Department of Labor Regulations

A reviewing court cannot reject the agency's interpretation "simply because the agency's chosen resolution seems unwise." *U.S.* v. *Mead Corp.*, 533 U.S. 218, 229 (2001). Thus, the rulings, interpretations, and opinions of the DOL's FLSA administrator "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Arriaga v. Florida Pacific Farms, L.L.C.,* 305 F.3d 1228, 1238 (11th Cir. 2002).

### 3.   The Fair Labor Standards Act

Congress enacted the FLSA in 1938 to eliminate "labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers." 29 U.S.C. § 202(a). The FLSA requires that all covered employers pay their employees at a rate of one and one-half times their regular rate of pay for time worked in excess of 40 hours in a workweek. 29 U.S.C. § 207(a).  The FLSA exempts from its overtime pay requirements employees who are employed in the capacity of outside salespeople from §§ 207's overtime requirements.   29 U.S.C. § 213(a)(1) ("any employee employed . . . in the capacity of outside salesman…" is exempt); *Jewel Tea Co. v. Williams,* 118 F.2d 202, 208 (10th Cir. 1941).  FLSA overtime exemptions are "affirmative defense[s] on which the employer has the burden of proof, *Corning Glass Works v. Brennan,* 417 U.S. 188, 196–97, (1974), and those exemptions "are to be narrowly construed against the employer seeking to assert them. *Arnold v. Ben Kanowsky, Inc*., 361 U.S. 388, 392 (1960).  The employer bears the burden of proving the applicability of the FLSA exemption by clear and convincing evidence.  *Klinedinst v. Swift Investments, Inc.,* 260 F.3d 1251, 1254 (11th Cir. 2001) (clear and affirmative); *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993) (clear and convincing).

## B. DEFENDANTS' CANNOT ESTABLISH THE EXEMPTION BY CLEAR AND CONVINCING EVIDENCE

The exemption derives from the incompatibility of minimum wage requirements with the individual character of the work of such salespersons.  *Jewel Tea Co.,* 118 F.2d at 208. The FLSA authorizes the Department of Labor (the "Department") to "define[] and delimit[]" the terms used in 29 U.S.C. 213(a)(1). In 1938, 1940, and 1949, the Secretary of the Department of Labor (the "Secretary") promulgated regulations aimed at interpreting the "outside salesman" exemption. At least by 1949, those regulations distinguished between exempt outside salesmen (who consummated their own sales) and nonexempt promoters (who stimulated the overall sales of their companies but did not consummate their own sales). *See* 14 Fed. Reg. 7730 (Dec. 28, 1949) (codified at 29 C.F.R. 541.500-504 (Cum. Supp. 1962)). In both 1940 and 1949, after holding hearings, the Department of Labor (Department) issued reports on proposed changes to the regulations. See U.S. Dep't of Labor, Wage & Hour Div., *"Executive, Administrative, Professional . . . Outside Salesman" Redefined: Report and Recommendations of the Presiding Officer at Hearings Preliminary to Redefinition* (Oct. 10, 1940) (*Stein Report*); U.S. Dep't of Labor, Wage & Hour & Public Contracts Div., *"Executive" "Administrative" "Professional"*

4

*"Local Retailing Capacity" "Outside Salesman": Report and Recommendations on Proposed Revisions of Regulations, Part 541* (June 30, 1949) (*Weiss Report*).

The Department's FLSA regulations remained virtually unchanged for 55 years. In 2004, following notice-and-comment procedures, the Department revised its "outside salesman" regulations. *See* 69 Fed. Reg. 22,122 (Apr. 23, 2004) (revising 29 C.F.R. §§ 541.500-504). The 2004 revisions, however, did not make any relevant substantive changes. Thus, the regulations continue to provide that an outside salesman must be primarily engaged in making sales or obtaining service orders, 29 C.F.R. § 541.500(a)(1)(i)-(ii); that making sales of goods requires the transfer of title to those goods, 29 C.F.R. § 541.501(b); and that promotional work is not exempt unless it is directed toward consummation of the employee's *own sales*, 29 C.F.R. § 541.503. The current regulations maintain the distinction between sales work and promotional work that the Department first articulated in the 1940s, even though several commenters requested that the distinction be eliminated during the 2004 rulemaking session. *See* 69 Fed. Reg. at 22,162. In clarifying the scope of the exemption, the Department explained that "[a]n employer cannot meet this requirement unless it demonstrates objectively that the employee, in some sense, has made sales." *Id.* Here, Defendants cannot meet their burden to establish the exemption since it is undisputed that *Defendants do not sell anything* and Plaintiffs did not make any sales (Facts ¶ 22) and that Plaintiffs' primary duties were clerical work and promotional work directed towards facilitating the ***Defendants'*** real estate empire.

The Code of Federal Regulations defines an "employee employed in the capacity of outside salesman" as any employee…"[w]hose primary duty is…making sales within the meaning of [29 U.S.C. § 203(k)]", or "[o]btaining orders or contracts for services or for the use of facilities for which a consideration will be paid by the client or customer; and "[w]ho is customarily and regularly engaged away from the employer's place or places of business in performing such primary duty." 29 C.F.R. § 541.500(a). The referenced statutory provision 29 U.S.C. § 203(k) states that "'[s]ale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." Additionally, in accordance with 29 C.F.R. § 541.700:

> [t]o qualify for exemption under this part, an employee's "primary duty" must be the performance of exempt work.... Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties

> as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.

*Id.* § 541.700(a). "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee." *Id.* § 541.700(b). Specifically, "[i]n determining the primary duty of an outside sales employee, work performed incidental to and in conjunction with the employee's own outside sales or solicitations, including incidental deliveries and collections, shall be regarded as exempt outside sales work. Other work that furthers the employee's sales efforts also shall be regarded as exempt work including, for example, writing sales reports, updating or revising the employee's sales or display catalogue, planning itineraries and attending sales conferences." 29 C.F.R. § 541.500(b).

The sales regulation at § 541.501 restates the statutory definition of sale discussed above and clarifies that "[s]ales within the meaning of [29 U.S.C. § 203(k)] include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property." 29 C.F.R. § 541.501(b).

The promotion-work regulation at § 503 states that "[p]romotion work" as "one type of activity often performed by persons who make sales, which may or may not be exempt outside sales work, depending upon the circumstances under which it is performed." 29 C.F.R. § 541.503(a). Promotion work that is "performed incidental to and in conjunction with an employee's own outside sales or solicitations is exempt work," whereas promotion work that is "incidental to sales made, or to be made, by someone else is not exempt outside sales work." *Id.* The regulation further clarifies the scope of the "outside salesman" exemption by giving examples of exempt and nonexempt promotional work. For instance, the regulation discusses "a company representative" who visits a store and performs various tasks that include "consult[ing] with the store manager when inventory runs low" but do not include "obtain[ing] a commitment for additional purchases." 29 C.F.R. 541.503(c). Under the regulation, such a representative "does not consummate the sale nor direct efforts toward the consummation of a sale," and his in-store promotional activities are "not exempt outside sales work." *Id.* The regulation further explains that a "manufacturer's representative" is exempt as an outside salesman only if his "primary duty is making sales or contracts." 29 C.F.R. 541.503(b). "Promotion activities directed toward consummation of the employee's own sales are exempt," the regulation reiterates, whereas

"[p]romotional activities designed to stimulate sales that will be made by someone else are not exempt outside sales work." *Id.*

The Department has long taken the position that the term "outside salesman" is limited to employees who make their own sales, and does not encompass workers who perform promotional functions that facilitate sales by others. *See* 29 C.F.R. §§ 541.500-504  Thus, under the applicable framework, Plaintiffs are not covered by the exemption because Plaintiffs were not involved in making any sales; at best, they were tasked with the occasional promotion of Defendants' properties to tenants for lease, which involved no change in title (and thus, no sale at all) at Defendants' places of business; said promotion was exclusively completed at the express instruction of Defendants in accordance with their proscribed policies and procedures, which Plaintiffs had no ability or authority to modify without the express consent of Defendants. Consequently, Plaintiffs did not obtain any orders or any contracts for services or for use of the facilities and were not customarily and primary engaged away from the Defendants' places of business. (Facts ¶¶ 7-9, 14). During those occasions when Plaintiffs were required to leave Defendants' office location (where they spent more than 70% of their work day) to promote the leasing of Defendants' properties by prospective tenants, they met the prospective tenants at a location which was owned by the Defendants and thus, were never engaged away from the Defendants' place of business. (Facts ¶¶ 7, 9, 14).   Plaintiffs did not draft sales reports, update or revise employee sales, display catalogues, plan itineraries or attend sales conferences at any point during their employment with the Defendants, as there were no sales. (Facts ¶ 9). Thus, sj is not warranted in Defendants' favor.

### 1. The CLA's Primary Duty Was The Facilitation of Defendants' Real Estate Empire, not Making Sales

Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole. Factors to consider when determining the primary duty of an employee include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; the employee's relative freedom from direct supervision; and the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee. 29 C.F.R. § 541.700(a). Even assuming *arguendo* that the CLAs' clerical and support activities are

"sales" within the meaning of the FLSA, the question remains as to whether such "sales" are their primary duty. Several major considerations work to the CLAs' advantage.

First, while it is Plaintiffs' contention that the acting of leasing a property does not constitute a sale, since the transfer of title is non-existent, even if a lease were to be considered a sale, the exemption fails as a matter of law since Plaintiffs ***never*** executed any leases for Defendants, to the contrary, spent the vast majority of their time answering the phones and providing general customer service support, which included informing callers of Defendants' hours of operation, directions, website information, transferring calls to the appropriate department, completing various miscellaneous tasks like, responding to e-mails and completing rote data entry, and running errands for J.B. and D.T. that were not remotely incidental to commercial real estate, like picking up vitamins and juice for J.B., pick up J.B. or D.T.'s cars from the mechanic, and purchase clothing and accessories for J.B.'s girlfriends. (Facts ¶ 9). "The amount of time spent performing exempt work can be a useful guide in determining whether exempt work is the primary duty of an employee." *Id.* § 541.700(b). From this broad range of responsibilities alone, a jury could conclude that making sales is not the primary responsibility of the CLAs. *Killion*, 761 F.3d at 585. Moreover, the undisputed evidence demonstrates that CLAs spent a majority of their time on tasks other than negotiating leases, as CLAs had no independent authority to do so and did not execute ***any*** leases said power was possessed exclusively by Defendant J.B. and D.T.  (Facts ¶¶ 7-10). This fact is confirmed by the fact that Defendants have failed to point to a single lease agreement signed by either Plaintiff in this case. These factors militate against exempting the CLAs from the FLSA's overtime requirements; as the primary duty of sales agents is selling and the primary duty of those who answer telephones is answering telephones, it is clear that Defendants have failed to sustain their burden of proof that Plaintiffs fall within the exemption of outside salespeople. *See Donovan v. Walter W. Cheney, Inc.,* 510 F. Supp. 748, 752 (D.N.H. 1981) (holding employees who were employed as real estate persons and paid solely on a commission of gross sales price without receiving either a salary or a draw against commission, who were required to perform "floor" or "guest" work at employer's principal business premises in shifts of at least four hours and who spent more than 20% of their time performing nonexempt work which was not in connection with their own individual sales efforts and for which they could not reasonably expect compensation, were not within the outside sales exemption). Therefore, sj should be denied as Defendants' have failed to establish Plaintiffs' primary duty was making sales within the meaning of section 3(k) or obtaining orders

or contracts for services or the use of facilities by clear and affirmative evidence. *See Liberty Lobby,* 477 U.S. at 247; *Klinedinst,* 260 F.3d at 1264.

        a.   **CLAs Did Not Make Any "Sales" Within the Meaning of Section 3(k) of the Act or Obtain Orders or Contracts for Use of Facilities**

    Sales within the meaning of section 3(k) of the Act include the transfer of title to tangible property, and in certain cases, of tangible and valuable evidences of intangible property. Section 3(k) of the Act states that "sale" or "sell" includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." 29 C.F.R. § 547.501(b). The Department has taken the position that an employee does not make a "sale" for the purpose of the exemption "unless he actually transfers title to the property at issue" which Plaintiffs assert is entitled to *Auer* deference, under the circumstances present in the instant case. *See Christopher v. SmithKline Beecham Corp.,* 132 S. Ct. 2156, 2166 (2012). Courts considering the applicability of this exemption have frequently held that the exemption is inapplicable in situations where employees are simply facilitating the sales for the employer as opposed to actually making the sales. *See Skipper v. Superior Dairies, Inc.*, 512 F.2d 409, 416 (5th Cir. 1975) (holding the outside sales exemption was not applicable where employer predetermined the manner in which the goods would be sold and the contractual agreement that would govern the sale of goods). Here, after being faced with the undisputed facts, Defendants admitted that they are involved in a purely service industry and do not sell anything at all. [DE 305 at 7].

    Plaintiffs are not involved in ***any*** transactions involving the transfer of title to tangible property, any exchange of property, any contract to sell, any consignment for sale, any shipment for sale or any other sales related disposition (Facts ¶ 7-10). In fact, Defendants themselves admitted that they do not sell any properties and that there is no commercial sales department. (Facts ¶ 8). Defendant J.B.'s uncontroverted testimony is that the CLAs "don't sell anything." (Facts ¶ 8). J.B. further admitted that it is an entire team effort involving leasing and property management and that CLAs role is to show space and their job is production work. *Id.* at 398-400. Baker confirmed CLAs did not sell anything, and certainly did not make sales at a "[customer's] place of business." (Facts ¶ 8). CLAs did not draft sales reports, update or revise employee sales, display catalogues, plan itineraries or attend sales conferences at any point during their employment with Defendants, as there were no sales. (Facts ¶ 8). Thus, Defendants MSJ must be denied. *See* 29 C.F.R. § 541.501(b); *Fed. R. Civ. P.* 56(c).

Notwithstanding these undisputed facts, Defendants cite to *Christopher* for the proposition that obtaining prospective tenant commitments for commercial leases constitutes "sales" within the meaning of the FLSA.  [DE 305 at 6].  However, a careful review of the Court's analysis in *Christopher* clearly demonstrates that it provides no support for Defendants' arguments in the instant case, as it is easily distinguishable on a number a crucial grounds.

Initially, *Christopher* required the Supreme Court "to decide whether the term 'outside salesman,' as defined by the Department of Labor ..., encompasses pharmaceutical sales representatives." *Christopher*, 132 S.Ct. at 2161. Specifically, the case considers the issue of whether or not ""nonbinding commitments from physicians to prescribe [certain] prescription drugs in appropriate cases" constituted a "sale" for FLSA purposes. *Id.* In its analysis, the Court first noted that the FLSA states that the term " '[s]ale' or 'sell' includes any sale, exchange, contract to sell, consignment for sale, shipment for sale, or other disposition." *Id.* at 2176 (quoting 29 U.S.C. § 203(k)) (alterations in original). Focusing on the term "other disposition," the Court reasoned that, "we are hard pressed to think of any contract for the exchange of goods or services in return for value or any firm agreement to buy that would not also fall within [the Act's] specifically enumerated categories." *Id.* at 2171. Accordingly, the Court concluded that " 'other disposition' is most reasonably interpreted as including those arrangements that are tantamount, in a particular industry, to a paradigmatic sale of a commodity." *Id.* at 2171–72. The Court then determined that "in the unique regulatory environment within which pharmaceutical companies must operate," "[o]btaining a nonbinding commitment from a physician to prescribe one of respondent's drugs" would constitute a sale for FLSA purposes. *Id.* at 2172. Notably, Defendants have made no reference to any "unique regulatory environment" within which CLAs must operate and have provided no support (other than argument of counsel) to the proposition that CLAs obtained any commitments, let alone, "prospective tenants' commitments."

The factual circumstances present in *Christopher* further demonstrate the limited nature of the Court's holding and its inapplicability to the present circumstances.  First, the petitioners were employed by Defendants as "pharmaceutical sales representatives" that spent about 40 hours, of their 50-60 hour workweek in the field, per week, calling on physicians during normal business hours. *Id.* at 2164. Consequently, the pharmaceutical sales representatives were actively obtaining commitments from physicians for 67% to 80% of their work week, while Plaintiffs in the instant case confirmed that they were out of the office showing prospective tenants space, at

most 29% of the time in the case of KS and as little as 8% of the time in the case of SB. (Facts ¶ 9). Thus, the undisputed evidence establishes that Plaintiffs were not "out in the field" a majority of their work week deciding where in a geographical territory they could go to maximize commitments like the reps in *Christopher*, which militates against a finding that CLAs were exempt from the FLSA under the exemption.

The sales reps were responsible for calling physicians in an assigned territory to discuss the features, benefits and risks of an assigned portfolio of defendant's prescription drugs to obtain non-binding commitments. *Id.* Here, the undisputed evidence demonstrates that the CLAs were not assigned to call specific prospective tenants to discuss the benefits of Defendants' commercial leasing properties and instead, spent virtually all of the time that they spend on the telephones, answering questions from ***current*** tenants regarding issues ranging from maintenance to payments, transferring calls to other departments and answering general customer service questions regarding the address of the Investments Limited offices, Investments Limited hours of operation, and the Investments Limited website.  (Facts ¶ 7-9).  In fact, the Defendants have an entire marketing department whose focus is to attract prospective tenants through marketing campaigns and website information.  (Facts ¶ 9).

Moreover, the Sixth Circuit considered the scope of the *Christopher* holding and noted that it was not applicable to cases that do not involve a "unique regulatory environment" or the term "other disposition," such as a "nonbinding commitment." *Killion v. KeHE Distributors, LLC*, 761 F.3d 574, 584 (6th Cir. 2014). Ultimately, the *Killion* Court determined that *Christopher* is of limited import to the underlying case before determining that summary judgment was not appropriate for four sets of employees who were involved in selling the defendant's products:  (1) the customer-development team that establishes the initial relationship with a store; (2) the business-development team that negotiates the broad parameters of the overarching distribution contract; (3) the account managers, who determine which products will be sold in the chain stores and who are responsible for growing sales and presenting everything that is needed to increase those sales; and (4) the sales representatives, who provide store support by determining the quantities of KeHE products to be ordered, who cold call independent stores , chose the mix of defendant's products sold there and who write and transmit orders for subsequent delivery in order to maintain proper inventory levels. *Id.* Notwithstanding these facts, the Court, in considering the applicability of the exemption, held that a jury could conclude that those four sets of employees do not actually make sales. *Id.*   The court emphasized that

defendant offered no evidence that the employees' solicitations ever affected a significant increase in sales to a store independently of significant increases in consumer demand for appellee's products or the presence of an advertising promotion authorized by the chain which required additional stock. *Id.* at 584-85.

Here, Defendants have failed to set forth any record evidence to establish the existence of "unique regulatory environment" or the term "other disposition," such as a "nonbinding commitment." Moreover, unlike the sales reps in *Christopher*, the CLAs did not make any sales whatsoever (as no transfer of title was involved in any transactions in the commercial leasing office), did not establish the initial relationships with tenants, as many were former tenants or walk-ins, did not negotiate any terms of any lease agreement, could not change the terms of any lease agreement without approval, did not execute any leases, did not determine which properties would be leased and did not cold-call businesses to solicit tenants, which supports the conclusion that summary judgment should be denied because a jury could easily conclude that the CLAs did not make any sales. (Facts ¶¶ 7-12). Like defendant in *Killion*, Defendants in this case have failed to set forth any record evidence that ***any*** of the tasks completed by the CLAs on a regular basis resulted in any sales whatsoever, let alone an increase in sales independent of significant increases in consumer demand or Defendants' promotions, which include, but are not limited to, the Investments Limited website (https://investmentslimited.com/) and Investments Limited signage all throughout Palm Beach County.

### b. CLAs Did Not Obtain Orders or Contracts For Services and Use of Any Facilities

Defendants allege that CLAs' primary duty was to obtain commitments from prospective tenants for commercial leases for the use of facilities. [DE 305 at 5, 7]. Notably, Defendants repeatedly use this terminology but have been unable to point to a ***single*** contract obtained by any of Plaintiffs, in this case, despite having an obligation to prove the applicability of the exemption by clear and convincing evidence. *Klinedinst,* 260 F.3d at 1254. Defendants also argue that obtaining commitments to buy is considered to be a sale; however, the evidence is undisputed that the CLAs were not involved in any sales whatsoever (Facts ¶¶ 7-9) and did not obtain any commitments to buy anything, since the commercial leasing department did not sell anything. (Facts ¶ 8). The uncontroverted testimony is that Plaintiffs' primary duty was essentially that of a customer service representative facilitating the leasing and management of commercial real estate property owned by Defendants, largely from Defendants' offices, through

the completion of pre-assigned tasks, including answering telephones in a secretarial capacity, routine data entry, clerical work and other errands which had no relation to the Defendants' general business (*e.g.*, picking up Defendant James Batmasian's car from the mechanic and babysitting the Commercial Leasing Director's children, which is basic customer service type work. (Facts ¶¶ 7-8)). Thus, there can be no question that Defendants failed to carry their heavy burden to establish the applicability of the exemption, as the CLAs primary duty does not involve any form of sales and that Plaintiffs were not expected to, nor did they actually, obtain contracts for the use of facilities while employed by the Defendants. (Facts ¶¶ 7-10, 12)).

> ### c. The Work Performed by CLAs Was Non-Exempt as It Did Not Concern Matters Which Were Incidental or In Conjunction With Their *Own Individual Sales Efforts*.

CLAs could not determine their own hours of work (Facts II ¶ 18), did not *customarily or regularly* meet with prospective tenants and when they did *occasionally* meet prospective tenants, it was at Defendants' properties and not at the tenant's home or place of business (Facts ¶ 7); to the contrary, Plaintiffs were subject to constant supervision and required to abide by Defendants' strictly enforced policies, with no authority to deviate without the express permission of Defendants or their management team. (Facts ¶ 7-8, 11). At best, Plaintiffs' primary duties were comprised of general customer service work and promotion activities designed to stimulate lease agreements that will be consummated by someone else; and thus, are not exempt outside sales work." These tasks were not incidental to or in conjunction with Plaintiffs' sales work as they were not tasked with making any sales, did not consummate any sales, could not negotiate the terms of any sales and had no authority to bind Defendants. (Facts ¶ 7-8, 11-12). Moreover, the uncontroverted testimony established that the CLAs spent more than 50 percent of their average work week performing non-exempt work, 29 C.F.R. §§ 541.5, 541.507, as the telephone calls that they received, even those dealing with real estate, did not concern matters which were incidental to or in conjunction with their own individual sales efforts and they could not reasonably expect any compensation from such activity. (Facts ¶ 7).

> ### 2. CLAs Were Not Customarily and Regularly Engaged Away From the Defendants' Places of Business

The FLSA defines an employer's "place of business" as including "any fixed site, whether home or office, used by a salesperson as a headquarters or for telephonic solicitation of sales ... even though the employer is not in any formal sense the owner or tenant of the

property." 29 C.F.R. § 541.502. Courts have repeatedly found that the exemption is wholly inapplicable under circumstances where there is no evidence that the plaintiffs ever visited prospects at their homes or offices. *Brennan v. Modern Chevrolet Co.*, 363 F. Supp. 327, 331 (N.D. Tex. 1973), *aff'd*, 491 F.2d 1271 (5th Cir. 1974) (concluding that none of the employees involved could be afforded the exemption as they were not engaged in their activities away from the place of business of their employer, but in fact were employed to work on the premises of the employer and other locations owned and operated by their employer); *Billingslea v. Brayson Homes, Inc.*, 2006 WL 562198, at *8 (N.D. Ga.), *motion for relief from judgment granted on other grounds*, 2007 WL 2118990 (N.D. Ga.).

Courts considering the exemption have applied a distinction between employees who consummate sales at out-of-the-office locations and those employees who do not consummate sales there. *Ackerman v. Coca-Cola Enterprises, Inc.,* 179 F.3d 1260, 1266 (10th Cir. 1999). For example, in *Skipper v. Superior Dairies, Inc.,* 512 F.2d 409, 416 (5th Cir. 1975), the court reversed a district court's ruling that a dairy product distributor's routeman was covered by the exemption, reasoning that the sale of the dairy products was made not by the routeman but by other individuals in the company. *See id.* at 414–415.  In an earlier case, the Sixth Circuit reached a similar conclusion, holding that a soft drink bottler's routeman was not covered by the exemption because the routeman did not solicit orders and because the managers of the stores that he visited lacked the authority to enter into binding sales agreements with the routeman. *See Hodgson v. Klages Coal & Ice Co.,* 435 F.2d 377, 383 (6th Cir. 1970). In *Hodgson* and *Skipper*, the employees were actually engaged in sales, but still not exempt under the exemption; this factor militates against a finding that CLAs are exempt since CLAs did not make ***any*** sales at all and did not consummate ***any*** lease agreements. (Facts ¶¶ 7-10).

Defendants cite to *Billingslea II* and a January 25, 2007 DOL Opinion Letter (which is not binding on this Court) for the proposition that the commercial properties being shown by the CLAs are part of inventory to be leased and thus, somehow converted into the commercial tenant's place of business. [DE 305 at 14]. However, *Billingslea II* and the Opinion Letter does not stand for this proposition and the facts of the case an Opinion Letter are easily distinguishable from the facts of the instant case. First, the Opinion Letter addressed the precise question in *Billingslea II*; namely, "whether real estate salespeople who work out of model homes, set up as temporary sales facilities in a developing community, are "outside sales employees." *Billingslea v. Brayson Homes, Inc.,* 2007 WL 2118990, at *2 (N.D. Ga.). The

instant case involves no model homes and no temporary sales facilities as both Defendants' Office location and the commercial properties shown to tenants are **permanent** facilities, owned by Defendants in established communities.  Finally and most importantly, the primary duty of the plaintiffs in *Billingslea* was to sell homes and they spent most of their time on sales-related activities, which must be contrasted with the overwhelming facts and admissions by Defendants that they do not sell anything and thus, CLAs spent 0% of their time engaged in "sales-related activities." (Facts ¶¶ 7-9).

> **a. CLAs Spent More Than 70% of Their Work Week Working From Defendants' Boca Raton Offices and Did Not Provide Any Services At The "Customer's" Home or Place of Business**

It is undisputed that Plaintiffs were required to spend an overwhelming majority of their time working at the Defendants' office building located at 215 North Federal Highway, Boca Raton, Florida 33432 ("Defendants' Office"). (Facts ¶ 9). On a typical workweek, Sotomayor would only spend 15 hours per week out of the office showing tenants commercial space owned by the Defendant, as compared to the 37 or more hours spent working at Defendants' offices.  (Facts ¶ 9). Consequently, Sotomayor spent, at most, 29% of her time working out of the office, as compared to the overwhelming majority (71%) of the time she spent working at Defendants' offices.  (Facts ¶ 9). Similarly, Blake spent only four to five hours out of the office, during the week and worked from Defendants' offices a "majority" of the time; this constitutes occasional work out of the office. (Facts ¶ 9). Consequently, there is no record evidence which can support the contention that Plaintiffs were **customarily** and **regularly** engaged away from the employer's business, which requires greater than occasional but less than constant engagement. *See Diaz v. Team Oney, Inc.*, 291 F. App'x 947, 950 (11th Cir. 2008). The circumstances under which Plaintiffs were employed are about as far away as one could get from the spirit of the regs which sought to exempt those employees who traveled from door-to-door making sales at customer's home or business; specifically, considering the fact that Plaintiffs were unable to execute any leases, otherwise bind Defendants or negotiate any terms of the lease agreements and that Plaintiffs were required to spend a majority of their day at Defendants' offices and when they did leave to meet with prospective tenants, were required to meet at Defendants' properties and never at the home or place of business of the prospective tenant(s).  (Facts ¶¶ 7-14).

> **3. The Compensation Structure of the CLA Position Does Not Support the Outsides Sales Exemption**

The compensation structure of the CLAs militates against exempting the CLAs from the FLSA's overtime requirements, as the CLAs compensation was discretionary and negligible. (Facts ¶ 15). The base pay for the CLAs according to but actual records show that it is $26,000 - $60,000.  *Id.* CLAs could receive $500 per lease credited to them after they were credited with four leases in a month.  *Id.* However, there are months that Plaintiffs never received a commission—SB received $2,000 in commissions one year. *Id.* CLA pay is subjected to docking by Defendants.  *Id.* In fact, KS was actually docked by Defendants. *Id.* CLAs were classified by Defendants as "salaried" but JB always started CLAs out as hourly employees. *Id.* All CLAs were compensated on an hourly basis. *Id.*  Defendants generated Investments Limited Pay documents that showed the CLAs annual pay and any commissions, and those forms are attached to Mr. Baker's affidavit the handwriting on them is Mr. Batmasian's and any increase in pay or gas card, or commission, had to be approved by him in writing, and they show that most CLAs received few if any commissions, and those that received same it was not even one-third of their pay.  *Id.* Thus, in the instant case, the CLAs credits toward commissions were subject to J.B. and D.T.'s discretion as they could arbitrarily decide that any particular CLA was not entitled to a credit toward commissions and thus, the commissions that the CLAs received were in no way guaranteed as a part of their compensation package. *Id.* Furthermore, most CLAs received few if any commissions, and those that received same it was not even one-third of their pay. *Id.*

The *Reyes* and *Gregory* case cited by Defendants for the proposition that commissions on their own support a determination that an employee is an outside salesman are easily distinguishable.  In *Reyes*, Goya sales brokers did not report to the Goya offices on a regular basis except to attend monthly sales meetings, worked with little supervision, set their own schedules, and were paid a commission based on their individual volume of sales, unlike the CLAs who reported to Defendants' offices on a daily basis, worked under constant supervision, could not set their own scheduled and who were given *credits* for commissions on a discretionary basis as approved by Defendant J.B.  (Facts ¶ 14, 15).  *Reyes v. Goya Foods, Inc.,* 549 F. App'x 876, 877-78 (11th Cir. 2013). In *Gregory*, the plaintiff was compensated "solely on a commission basis," unlike CLAs whose commissions made up far less than 1/3 of their pay at most high and at least no part of their pay.  (*Facts* ¶ 15). Moreover, numerous cases hold that employees who receive commissions and bonuses are non-exempt under the exemption. *See Ackerman v. Coca-Cola Enterprises, Inc.*, 179 F.3d 1260, 1262 (10th Cir. 1999) (reversing grant of sj on exemption where plaintiffs worked more than 40 hours per week and were paid salary,

bonuses and commissions); *Palacios v. Boehringer Ingelheim Pharm., Inc.,* 814 F. Supp. 2d 1357, 1361 (S.D. Fla. 2011) (denying defendant's msj on the exemption where plaintiff's annual base compensation was $55,000 during her last year of employment plus between $25,000 and $40,000 per year in commissions).

### 4. The Applicability of the Outside Sales Exemption Under in the Instant Case Would Run Contrary to the "Terms and Spirit" of the FLSA

Congress enacted the FLSA in 1938 with the goal of "protect[ing] all covered workers from substandard wages and oppressive working hours." Among other requirements, the FLSA obligates employers to compensate employees for hours in excess of 40 per week at a rate of 1 ½ times the employees' regular wages. *Christopher*, 132 S.Ct. at 2162 (internal citations omitted). Here, Plaintiffs were initially told that they were required to work 40 hours a week; however, shortly after they began their employment with Defendants, Plaintiffs were told that they were required to work through lunches and work every other Saturday from 10:00 a.m. to 2:30 p.m. or be subject to docking. (Facts I ¶¶ 18, 21). Thus, the undisputed record demonstrated that Plaintiffs worked in excess of 40 hours per week without overtime pay, and therefore, are the exact type of covered worker that the FLSA seeks to protect. *Id.* This evidence requires the conclusion that the CLAs were little more than minimum wage employees, as SB's hours at 60 or so per week divided into his approximate $30,000 annual pay means his effective hourly rate was $9.60/hr. (Facts ¶15; Facts II ¶ 21). Additionally, the purpose Outside Sales Exemption is premised on the belief that exempt salespeople performed a kind of work that "was difficult to standardize to any time frame." *Christopher*, 132 S.Ct. at 2173; however, in the instant case it was incredibly easy for the Defendants to tracking the CLAs time spent outside of the office because 1) Defendants' standardized the CLA's working hours by requiring them report to the office by a certain time in the morning and be present in the office at the end of the day and 2) Defendants tracked the time the CLAs spent outside of the office using sign-in sheets and Empower software. Thus, the imposition of the Outside Sales Exemption under these circumstances would run contrary to the spirit of the FLSA. (Facts ¶¶ 11, 14, 18)

### 5. Sotomayor Was Not a "Salesperson" Based on the Undisputed Evidence

Defendants argue that K.S. is a "salesperson" for the purposes of the exemption by citing to a Complaint that was rendered null and void by an Amended Complaint filed well before Defendants argued that such statements constituted "undisputed evidence." [DE 305 at 18]. On or about November 7, 2016, K.S. filed her Corrected First Amended Complaint in an unrelated

state case filed pursuant to the Florida Civil Rights Act in the case captioned *Sotomayor v. Batmasian et al.* Case No. 2014 CA 007354. (*See* Facts ¶ 16). K.S.'s Corrected First Amended Complaint simply abbreviated some names with initials. (*See* Facts ¶ 16). K.S.'s Corrected First Amended Complaint was accepted by the Court and thus, is the operative pleading in the *Sotomayor v. Batmasian et al.* case. In fact, Defendants in the *Sotomayor v. Batmasian* case answered KS's Corrected First Amended Complaint on or about November 22, 2016. (*See* Facts II ¶ 16). Consequently, the Corrected First Amended Complaint filed by the undersigned "supersede[d] the former pleading; the original pleading [was] abandoned by the amendment, and [is] no longer a part of [Ms. Sotomayor's] averments against [her] adversar[ies]. *See Hoefling v. City of Miami*, 811 F.3d 1271, 1277 (11th Cir. 2016) (citing *Dresdner Bank AG v. M/V Olympia Voyager,* 463 F.3d 1210, 1215 (11th Cir. 2006). Thus, once K.S.'s Corrected First Amended Complaint was accepted by the state court, the original complaint, attached as Attachment 1 to Defendants' Motion, was superseded and the citations referenced by the Defendants rendered null and void. *Id.*

Defendants also argue that Sotomayor admitted that she was a "salesperson" for the proposes of the exemption in a deposition in the same unrelated state Florida Civil Rights Act case [DE 305 at 18]; however, this argument represents a complete mischaracterization of the facts. In reality, Sotomayor testimony was as follows:

Q.      And you drafted that complaint, right?

A.      I went to Mr. Kleppin and we drafted… ***I give the information and he drafted it.***

(Facts ¶ 16, citing to page 463:15-19 of Sotomayor's July 22, 2015 deposition in *Sotomayor v. Batmasian et al.* Case No. 2014 CA 007354). Further, her deposition in that case cannot be used as substantive evidence in this case, only possibly for impeachment. Sotomayor said nothing in that deposition regarding whether she was exempt or not, how often she was outside of the 215 N. Federal Highway office, or any of the pertinent facts that makeup the exemption.

Defendants' disingenuous citation apparently represents an ineffective attempt to overcome the overwhelming record evidence which confirms that Plaintiffs do not fall within the exemption. However, Defendants "attempt" does not comport with binding precedent which holds that Section 213(a)(1) discounts titles in favor of actual worked performed where employer give non-exempt employees titles in an attempt to evade the FLSA. *See Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1244 (11th Cir. 2008); *see also Meyer v. Worsley Companies, Inc.,* 881 F. Supp. 1014, 1019 (E.D. N.C. 1994). Even in this case, Plaintiffs were not given the

title salesperson, but rather CLA.  Thus, the manner in which Sotomayor referred to herself, outside of the context of the exemption, is entirely irrelevant in ruling on Defendants' MSJ. *Id.*

Defendants also remarkably failed to mention that the above-referenced deposition testimony was derived from an unrelated, incomplete state court deposition of Sotomayor in a sexual harassment case which has no relevance to the instant case brought pursuant to the FLSA. Notably, *Sotomayor v. Batmasian et al.* is a sexual harassment case brought pursuant to the Florida Civil Rights Act that makes no mention of the FLSA and has no relation to the claims or defenses present in instant case. Moreover, the undersigned has not yet had an opportunity cross-examine Sotomayor in the *Sotomayor v. Batmasian et al.* case; thus, the deposition testimony cited by Defendants may not be considered by the court when considering Defendants' summary judgment motion. *See Evans v. McClain of Georgia, Inc.,* 131 F.3d 957, 962 (11th Cir. 1997) (holding that inadmissible evidence is to be disregarded when offered for summary judgment purposes); *Prichard v. Southern Co. Servs.,* 92 F.3d 1130, 1134 (11th Cir. 1997) (holding same).

Additionally, it would run contrary to the interests of justice to take judicial notice of a superseded complaint and incomplete deposition from an unrelated state court case; particularly, considering that Defendants have vigorously objected to *any* attempt to use materials derived from the instant case in *any* state cases involving the Defendants. This Court should not that defense counsel has repeatedly objected to undersigned use of deposition testimony from the instant case in *any* state cases involving the Defendants and in fact, the magistrate judge has entered a report and recommendation that Plaintiffs' counsel inappropriately asked questions in this case concerning other cases (which is currently being appealed) leading defense counsel to argue that Plaintiffs' counsel has been "sanctioned" (the R&R reserved ruling on sanctions) for violating this Court's instructions regarding the interjection of matters from state court cases into the instant case.  It is telling that Defendants have now shifted gears to use deposition testimony from K.S.'s state court case to gain a tactical litigation advantage in this case, considering that Defendants have attempted to levy sanctions against Plaintiffs' counsel for same.  Defendants should be estopped judicially from making such arguments.

### 6. The Defendants' Own Documents Admit That CLAs Were Non-Exempt Employees of the Defendants

Finally, as a matter of undisputed fact, Defendants themselves have expressly admitted that CLAs were non-exempt on their own hiring documents. Consider for example, the

Defendants' own internal employment action/data report forms, which confirm that the Defendants considered the CLAs to be "salaried *non-exempt*" employees. (*See* Facts II ¶ 17).



The CLAs had to sign this Employment Action/Data Report, which indicated (at least for most of the CLAs) that they were "non-exempt" meaning entitled to be paid overtime if they worked more than 40 hours (and the Defendants knew that the CLAs were non-exempt, as Mr. Rosenfeldt, former counsel for the Defendants, instructed them that they were and instructed that the Employment Action/Data Report forms should be truthfully filled out showing that the CLAs were non-exempt). (Facts ¶ 17). Some of the Employment Action/Data Report forms concerning the exempt or non-exempt status of CLAs are left blank but most of them are checked off as being non-exempt. *Id.* The CLAs had to sign numerous Investments Limited documents as part of the hiring process by Defendants. *Id.* The CLAs are employees of Defendants, as Investments Limited (not LSA Management, Inc.) direct deposited their payroll monies,[1] the CLAs had to sign an Authorization for Payroll Deduction in order to allow Defendants the right to make deductions from their payroll, if they wanted to dock them or for garnishment purposes. *Id.*

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' MSJ in light of Defendants' failure to establish the applicability of the exemption by clear and convincing evidence and since the record evidence establishes that there is no genuine issue of material fact such that Plaintiffs are entitled to summary judgment as a matter of law.

---

[1] In order to physically pay the approximately 200 employees that Defendants employed from 2007 to 2013 when Baker was employed there too, Defendants had a master zero balance account, out of which payroll monies were transferred into a zero balance account in the name of LSA Management, Inc. which is an entity solely owned and controlled by the Batmasians, and the payroll company (Paychex), debited the amount of the payroll every two weeks from the account in the name of LSA Management, Inc. containing Defendants' payroll monies. Defendants would then put the name LSA Management, Inc. on Defendants' employees' paystubs to make it look like LSA Management, Inc. was their real employer, when it was Defendants. (Facts ¶ 17 ).

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on January 31, 2017, a true and correct copy of the foregoing has been furnished via electronic mail to: George L. Sigalos, Esq. (glsassistant@SimonSigalos.com), Jennifer Boussy Carroll, Esq. (jcarroll@SimonSigalos.com) and Heather E. Kruzyk, Esq. (hkruzyk@SimonSigalos.com), Simon & Sigalos, LLP, 3839 N.W. Boca Raton Boulevard, Suite 100, Boca Raton, Florida 33431.

Respectfully submitted,

By:  s/ *Chris Kleppin*
        Chris Kleppin, Esq.
        Florida Bar No. 625485
        ckleppin@gkemploymentlaw.com
        Chelsea A. Lewis, Esq.
        Florida Bar No. 111608
        clewis@gkemploymentlaw.com
        Glasser & Kleppin, P.A.
        Attorneys for Plaintiffs
        8751 W. Broward Blvd, Suite 105
        Plantation, FL 33324
        Tel.  (954) 424-1933
        Fax  (954) 474-7405
Secondary E-mails:    esinclair@gkemploymentlaw.com
                                    dcano@gkemploymentlaw.com